Richard MORALES, Plaintiff,

v.

QUINTEL ENTERTAINMENT, INC.
and Peter Stolz, Defendants.

No. 98 Civ. 7071(WCC).

United States District Court,
S.D. New York.

Oct. 27, 1999.

Law Offices of David Lopez, Southampton, New York, for plaintiff; David Lopez, Albert D. Barnes, of counsel.

Moses & Singer LLP, New York City, for defendant; Roger L. Waldman, Gregory J. Fleesler, of counsel.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Richard Morales brings this shareholder suit pursuant to Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (the "Act"), to recover profits realized by defendant Peter Stolz through his short-swing trading in common shares of Quintel Entertainment, Inc. ("Quintel"). Quintel is a named defendant

solely to bring all the necessary parties before the court. Before this Court are plaintiff's motion and defendant Stolz's cross-motion for summary judgment. For the reasons stated below, plaintiff's motion is denied and defendant Stolz's cross-motion is granted.

### BACKGROUND

Pursuant to a January 17, 1996 agreement [1] (the "PRN/Quintel Agreement"), Psychic Reader's Network ("PRN") sold its one-half interest in New Lauderdale LLC to Quintel. As an 11% shareholder of PRN, defendant Stolz received 352,000 shares of Quintel common stock as a result of this transaction. These shares represented less than 2.5% of the outstanding common stock of Quintel. The other two shareholders of PRN were Steve Feder, who owned 44.5% of PRN shares, and Thomas Lindsey, who owned 44.5% of PRN shares. Both Feder and Lindsey received 1,429,000 shares as a result of the PRN/Quintel Agreement.

The PRN/Quintel Agreement, negotiated by Feder and PRN's counsel with Quintel's Chief Executive Officer and Quintel's counsel, included several provisions restricting PRN shareholders from selling the Quintel stock that they received pursuant to the agreement. These provisions, commonly called "lock-up" provisions, are often included in merger and acquisition agreements.

The first lock-up provision, contained in Section 3.3 of the PRN/Quintel Agreement, prevented the PRN shareholders from selling shares of Quintel stock for two years unless a Quintel Principal sold shares. If a Quintel Principal sold shares, then each of the PRN shareholders had the right to sell a specific number of shares as determined by a formula. Each PRN shareholder could also sell a specific number of shares to pay taxes. The second lock-up provision, contained in Section 3.2.1 of the PRN/Quintel Agreement, re-

---

**1.** The PRN/Quintel Agreement was executed in September 1996.

stricted the PRN shareholders from selling more than a specific number of shares of Quintel stock in any quarter.

In December 1996, Stolz executed a Schedule 13D. The Schedule 13D indicated, by a check in the appropriate box, that Stolz was a member of a group. It also stated that a group "may be formed" which "may be deemed to be the beneficial owner" of the 3,388,000 shares of Quintel stock collectively owned by Feder, Lindsey and Stolz. Stolz filed four amendments to the Schedule 13D with the Securities and Exchange Commission ("SEC") that included the same information with respect to the existence of a group.

Defendant Stolz also filed one Form 5 and six Forms 4 with the SEC between February 1997 and September 1998. Each of these forms stated that the "Relationship of Reporting Person to Issuer" was a "Member of 13(d) group owning more than 10%." The cover letter accompanying each of these Forms also stated that Stolz was a member of a § 13(d) group owning more than 10% of Quintel stock.

Defendant Stolz claims that the Schedule 13D and the Forms 4 and 5 were prepared by his attorney and he signed them without regard to the statements that he was a member of a group.

Between November 1996 and August 1998, defendant Stolz made forty (40) purchases and fifty-one (51) sales of Quintel stock. Plaintiff seeks disgorgement of the profits Stolz made from these transactions based upon the allegation that the transactions were short-swing trading [2] by an insider.

## DISCUSSION

■ Under Federal Rule of Civil Procedure 56(c), the moving party is entitled to summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where there are cross-motions for summary judgment, "the standard is the same as that for individual motions for summary judgment and the court must consider each motion independent of the other.... Simply because the parties have cross-moved, and therefore have implicitly agreed that no material issues of fact exist, does not mean that the court must join in that agreement and grant judgment as a matter of law for one side or the other." *Aviall, Inc. v. Ryder System, Inc.*, 913 F.Supp. 826, 828 (S.D.N.Y.1996), *aff'd*, 110 F.3d 892 (2d Cir. 1997). When evaluating each motion, the court must consider the facts in the light most favorable to the non-moving party. *See id.*

In addition to moving for summary judgment on the issue of liability under § 16(b), plaintiff also requests an award of pre-judgment interest. Defendant opposes the motion on the issue of liability, opposes the reward of pre-judgment interest, and cross-moves for summary judgment.

### I. *Section 16(b)*

■ Section 16(b) of the Act allows an issuer of securities or a shareholder to bring an action for disgorgement of the profits made by a statutory insider from a purchase and sale of the issuer's securities that occurs within a six-month period. *See* 15 U.S.C. § 78p. Section 16(b) does not require a showing of bad faith, and "operates mechanically, and· makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power Co. v. Dow Chem. Co.*, 136

---

**2.** "Short-swing" trading is a purchase then sale or sale then purchase of the corporation's stock occurring within six months. *See*

Thomas Lee Hazen, *Federal Securities Law* 100 n. 384 (Federal Judicial Center 1993).

F.3d 316, 320 (2d Cir.1998). The stated purpose of the statute is to prevent the "unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer." 15 U.S.C. § 78p(b).

In order to establish liability under § 16(b), plaintiff must show (1) a purchase and (2) a sale of securities (3) by a beneficial owner of more than 10% of any class of equity security, director or officer (4) within a six-month period. *See Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir.1998). Defendant concedes that he made purchases and sales of Quintel stock within a six-month period. It is also undisputed that he is not a director or officer of Quintel. The only remaining issue is whether defendant is a beneficial owner of more than 10% of the Quintel common stock. Summary judgment is appropriate if there is no genuine issue of material fact underlying the legal question of whether defendant was a beneficial owner of more than 10% of Quintel common stock at the time of his short-swing transactions. *See Morales v. New Valley Corp.*, 999 F.Supp. 470, 472 (S.D.N.Y.1998), *aff'd Morales v. Freund*, 163 F.3d 763 (2d Cir.1999).

Section 16 requires a "two-tier" analysis of beneficial ownership. SEC Rule 16a–1(a) requires that, in order to be a beneficial owner under § 16(b), defendant must be a beneficial owner as defined by § 13(d) of the Act and defendant must have a pecuniary interest in the securities at issue. *See Morales*, 999 F.Supp. at 473. Pecuniary interest is defined as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R. § 240.16a–1(a)(2)(i). Defendant Stolz admits that he profited from the purchase and sale of Quintel securities, therefore he had a pecuniary interest in the Quintel securities.

■ Under Rule 16a–1(a)(1), for the purposes of determining whether a person is a beneficial owner of more than ten percent of any class of securities, a beneficial owner is "any person who is deemed a beneficial owner under section 13(d) of the Act and rules thereunder." Section 13(d) of the Act states in relevant part that "if two or more persons act as a . . . group for the purpose of acquiring, holding or disposing of securities of an issuer, such group shall be deemed a person" that may itself be deemed a beneficial owner. 15 U.S.C. § 78m(d)(3). If two or more persons are determined to be a "group" for the purposes of § 13(d), their stock holdings are aggregated to determine whether they are beneficial owners of 10% of the issuer's stock. Thus, if defendant Stolz acted with Feder and Lindsey "as a group for the purpose of acquiring, holding or disposing of" Quintel securities, their stock holdings would be aggregated to more than 18% and Stolz would be a beneficial owner of more than 10% of Quintel stock under § 16(b).

## II. *Section 13(d)*

■ The purpose of § 13(d) is "to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir.1971). In order to form a group under § 13(d), the defendants must have "combined in support of the common objective." *S.E.C. v. Savoy Indus.*, 587 F.2d 1149, 1162 (D.C.Cir.1978) (citations omitted). The pooling agreements that Congress targeted in § 13(d) will not always be in writing; a § 13(d) group may be proved with circumstantial evidence. *See id.* at 1162–63.

In this case, plaintiff alleges that the written PRN/Quintel Agreement is a pooling agreement in which defendant, Feder and Lindsey combined in support of a common objective. Defendant does not dispute that he signed the PRN/Quintel Agreement, but disputes that this agreement rendered him a member of a group

under § 13(d). Thus, we must consider whether, as a matter of law, the PRN/Quintel Agreement was an agreement between Stolz, Feder and Lindsey to act as a group with the purpose of acquiring, holding, or disposing of Quintel securities. We must also consider the significance of defendant's Schedule 13(d) and other SEC filings that indicated he was a member of a § 13(d) group.

## A. *Agreement to Acquire, Hold or Dispose of Quintel Securities*

■ Although the lock-up provisions in the PRN/Quintel Agreement control when and how Stolz, Feder and Lindsey can dispose of their Quintel securities, the provisions are not an agreement among them to acquire, hold or dispose of their securities. In determining whether there is a § 13(d) group, courts have considered common objectives to control the stock price or effectuate a shift in corporate control, the ability of the group members to exert influence over the corporation, and the voluntariness of the agreement to acquire, hold, or dispose of stock.

■ In order to find a § 13(d) group, a common objective among its members is required. In *Morales v. Freund*, a § 13(d) group was formed when the defendants entered into an agreement to use their best efforts to obtain voting control of the issuer's stock by acquiring more stock. 163 F.3d at 766. Similarly, the court found a prima facie case of a § 13(d) group in *Lerner v. Millenco* because the defendants coordinated their investments for the purpose of artificially maintaining the market price of the stock. 23 F.Supp.2d 337, 343 (S.D.N.Y.1998). In *Global Intellicom v. Thomson Kernaghan & Co.*, the common objective of the § 13(d) group was artificially to increase trading volume and decrease the value of the stock. 99 Civ.

342, 1999 WL 544708, at *14 (S.D.N.Y. July 27, 1999) (denying defendants' motion to dismiss).

There is no evidence that Stolz, Feder and Lindsey were trying to effectuate a shift in corporate control through the disposition of Quintel stock. In *S.E.C. v. Levy*, the defendant was a member of a § 13(d) group that agreed to use their stock to further the common objective of acquiring control over the issuing corporation. 706 F.Supp. 61, 71 (D.D.C.1989). Similarly, in *GAF Corp.*, the defendant was a member of a § 13(d) group whose members agreed to pool their stock holdings to attempt a corporate takeover. 453 F.2d at 717; *see also Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir.1982) (affirming district court's determination that defendants agreed to act in concert in disposing of their shares as part of an effort to effectuate a shift in corporate control).

In contrast to the agreements in the aforementioned cases, the PRN/Quintel Agreement was an agreement between two corporations to effectuate a sale of PRN's holdings in another company. Although the sale was in exchange for Quintel stock, the purpose of the agreement was not to acquire control of Quintel. Nor is there any other evidence of an agreement to attempt a corporate takeover.[3] The only common objective that Stolz, Feder and Lindsey shared was to sell PRN's holdings in New Lauderdale LLC. The lock-up provisions here do not reflect the objectives of Stolz, Feder and Lindsey, rather they exist to protect Quintel and Quintel shareholders. Quintel, not defendant Stolz and the alleged group, was trying to affect— i.e., protect—the price of Quintel stock.

Defendant Stolz did not agree with Feder and Lindsey to use their stock to exert

---

**3.** Plaintiffs point to the Schedule 13D, where defendant Stolz, Feder and Lindsey reserved the right to explore, among other things, the acquisition of additional Quintel stock, liquidation, sale of Quintel's assets, and a change in the management of Quintel. Reservation

of the right to influence the management of Quintel is not evidence of an attempt to effectuate a corporate takeover through the use of their shares. This provision, without other evidence, is insufficient to show a common objective among Stolz, Feder and Lindsey.

influence over Quintel. In *Savoy,* the defendant was a member of a § 13(d) group because he had a substantial interest in the corporation and exerted substantial influence through the disposition of his shares. *Savoy,* 587 F.2d at 1165. The defendant was suggesting acquisitions and business transactions to the corporation. *See id.* Unlike the defendant in *Savoy,* Stolz owned less than 2.5% of Quintel stock. Even combining Stolz's interest with the holdings of Feder and Lindsey, the alleged group would own about 18% of Quintel, and would be unable to exert substantial influence over Quintel. Further, there is no evidence that Stolz has attempted to exert influence over or get involved in the management of Quintel.

The SEC has ruled that Goldman Sachs' partners and employees, who had to sign a shareholders' agreement as a condition of receiving stock, were not subject to aggregation of their stock for the purposes of determining whether they were 10% beneficial owners under § 16(b), even though the agreement included lock-up provisions and voting agreements. *See Goldman Sachs Group, Inc., S.E.C. No–Action Letter* [1999 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 77,553 (April 30, 1999). The SEC Staff based its ruling in part on the shareholders' lack of ability to control Goldman Sachs because of the large number of shareholders and their small individual holdings. Similarly, each individual shareholder here owns a small percentage of Quintel stock. Although there are only three shareholders in the alleged group, there is no indication that Stolz, Feder and Lindsey had the ability, or common objective, to exert influence over Quintel.

Also relevant is whether the PRN/Quintel Agreement was voluntary. In the *Goldman Sachs No–Action Letter,* the SEC also based its ruling on the involuntariness of the shareholder agreement. *See id.* The partners and employees at Goldman Sachs had to agree to the lock-up and voting provisions, or they could not receive their shares of Goldman Sachs

stock. Similarly, the sale of PRN's holding in New Lauderdale LLC would not have occurred unless Stolz, Feder and Lindsey agreed to the lock-up provisions.

Considering the involuntary nature of the lock-up provisions, the lack of evidence that Stolz was attempting to exert influence over Quintel by acting with Feder and Lindsey, and the fact that the lock-up provisions reflect Quintel's objectives, defendant Stolz was not a member of a § 13(d) group as a matter of law.

**B. *Defendant's Schedule 13(d) and Forms 4 and 5***

■ Plaintiff also argues that defendant Stolz admitted that he was a member of a § 13(d) group by so indicating on the Schedule 13(d) and Forms 4 and 5 that Stolz filed with the SEC. Although these documents may be evidence of Stolz's belief that he was a member of a § 13(d) group, § 16(b) liability will not be imposed unless Stolz meets the statutory definition of a beneficial owner. Other courts in this District have held that a defendant's filings cannot "dispose of the question of statutory interpretation presented." *Levner v. Saud,* 903 F.Supp. 452, 461 n. 14 (S.D.N.Y. 1994) (quoting *Chemical Fund v. Xerox Corp.* 377 F.2d 107, 112 (2d Cir.1967)), *aff'd Levner v. Prince Alwaleed,* 61 F.3d 8 (2d Cir.1995); *see also Levy v. Seaton,* 358 F.Supp. 1, 4 (S.D.N.Y.1973) (filing "would not be dispositive if it was an unnecessary act based on a mistake of law"). Therefore, defendant's indications in his SEC filings that he was a member of a § 13(d) group are not dispositive of his legal status as a member of a § 13(d) group. Plaintiff also must show that as a matter of interpretation of § 13(d), defendant is a member of a group that agreed to acquire, hold or dispose of Quintel stock. Because we have found, upon application of § 13(d) to the undisputed facts, that defendant Stolz is not a member of a § 13(d) group, his SEC filings will not impose § 16(b) liability.

Because defendant Stolz is not a member of a group under § 13(d), we cannot aggregate his holdings of Quintel stock with those of Feder and Lindsey. As a less than 2.5% beneficial owner of Quintel stock, Stolz is not subject to § 16(b) liability.

## II. *Plaintiff's Claim for Pre–Judgment Interest*

We need not reach plaintiff's claim for pre-judgment interest because we have determined as a matter of law that defendant Stolz is not liable under § 16(b) for his short-swing trading in Quintel stock.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted. Plaintiff's complaint is hereby dismissed with prejudice as to all defendants and the Clerk of the Court shall enter judgment for defendant Stolz.

**SO ORDERED.**