CUTLER–HAMMER, INC., Plaintiff,

v.

LEEDS & NORTHRUP COMPANY, INC., Defendants.

No. 78–C–512.

United States District Court, E. D. Wisconsin.

May 1, 1979.

Michael, Best & Friedrich by Michael E. Husmann and Frank J. Pelisek, Milwaukee, Wis., for plaintiff.

Foley & Lardner by Steven E. Keane and Robert A. DuPuy, Milwaukee, Wis. (Robert C. Heim and Kathryn D. Portner, Philadelphia, Pa., of counsel), for defendants.

DECISION and ORDER

MYRON L. GORDON, District Judge.

The defendant has moved for summary judgment as to liability in this action. This case arises under section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). The section provides in pertinent part:

"For the purpose of preventing the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months."

Two questions are presented by the instant motion: (1) whether certain transac-

tions in which the plaintiff Cutler-Hammer was involved constitute a "purchase and sale" within the meaning of section 16(b), and (2) whether dividends paid to Cutler-Hammer are recoverable under section 16(b).

## I. FACTS

The following facts are undisputed. Prior to January 17, 1978, Cutler-Hammer owned 385,000 shares of Leeds & Northrup preferred stock which was convertible by Cutler-Hammer at any time into more than ten percent of Leeds common stock. Leeds common stock has been a registered security pursuant to section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l*, since before April, 1977. Under section 16(b) a beneficial owner is anyone who directly or indirectly owns more than ten percent of any class of registered equity security. Thus, for the purpose of this action, Cutler-Hammer was a beneficial owner of Leeds as of January 17, 1978. *Foremost-McKesson v. Provident Securities,* 423 U.S. 232, 234 n. 1, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976).

On January 17, 1978, Cutler converted its 385,000 shares of Leeds convertible preferred stock into 577,500 shares of Leeds common stock. Also on that date, Cutler purchased from Tyco Laboratories 724,440 shares of Leeds' common stock at a price of $30 per share. Both of these transactions were approved by Leeds in a written agreement dated January 17, 1978.

On February 1, 1978, Edmund B. Fitzgerald, Cutler's chairman of the board, and Oscar J. Reak, Cutler's president, were named to the Leeds' board of directors. They attended meetings of the board on March 1, 1978, April 5, 1978, and May 3, 1978, before tendering their resignations on June 22, 1978.

On June 22, 1978, Cutler sold its entire holding of Leeds common stock to General Signal Corporation at a price of $40 per share. During the approximately five months in which Cutler held the 724,440 shares of Leeds common stock purchased from Tyco, Cutler received dividends on those shares in the amount of $130,399.20.

An affidavit of Edmund Fitzgerald indicates that Cutler sold its Leeds stock after being informed by David Kimball, the president of Leeds, that Leeds and General Signal had agreed to a merger. Mr. Fitzgerald also avers that Mr. Kimball suggested that Cutler sell its Leeds common stock to General Signal.

On August 11, 1978, Cutler filed the instant action requesting the court to declare that it is not liable for profits it realized on the purchase and sale of Leeds common stock during the six-month period ending June 22, 1978. Alternatively, Cutler requested the court to declare that it was only liable for the profit from the sale of such stock and not for any dividends received while holding the stock. Leeds has counterclaimed for Cutler's alleged short-swing profits including the dividends Cutler received on the 724,440 shares of Leeds stock purchased from Tyco.

## II. THE EXISTENCE OF A "PURCHASE AND SALE"

Courts have consistently noted that with few exceptions section 16(b) applies to insider trading within the statutory time period:

> "In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect." *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972), quoting *Bershad v. McDonough,* 428 F.2d 693, 696 (7th Cir. 1970).

As an exception to the generally broad and arbitrary reach of section 16(b), the Supreme Court has held that when a trans-

action is "unorthodox" and not clearly within the reach of the statute, courts should determine whether the opportunity for speculative abuse existed, before finding liability under the section. *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 591–95, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

Cutler contends that its purchase of Leeds common stock from Tyco and its sale of those shares to General Signal does not fall within the ambit of section 16(b) because they were "unorthodox" transactions. The plaintiff's contention is based on the following facts: 1) Leeds had the right to approve the purchase and sale of the shares in question and 2) Cutler sold its Leeds common stock after having been given notice that Leeds was to be merged with General Signal, an action over which the plaintiff had no control. Since Cutler characterizes the transactions at bar as unorthodox, it urges the court to determine the possibility of speculative abuse before attaching liability to it under section 16(b).

 In my judgment, none of the factors cited by Cutler renders the transactions at bar "unorthodox." The fact that Leeds had the power to approve the purchase and sale of its own shares by Cutler, and did in fact agree to such transactions, does not immunize Cutler from liability under § 16(b). One of the statute's prime objectives is the prevention of questionable transactions on the part of insiders to the detriment of minority or outside shareholders who may have had no voice in the approval of the transactions. *Schur v. Salzman,* 365 F.Supp. 725, 733 (S.D.N.Y. 1973). Courts have consistently held, therefore, that waiver and estoppel are insufficient defenses as a matter of law to actions asserted under section 16(b). *Roth v. Fund of Funds, Ltd.,* 405 F.2d 421 (2d Cir. 1968), cert. denied, 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1969) (sale to issuer at its suggestion); *Magida v. Continental Can Co.,* 231 F.2d 843 (2d Cir.), cert. denied, 351 U.S. 972, 76 S.Ct. 1031, 100 L.Ed. 1490 (1956) (short-swing transactions entered into instigated by issuer).

Moreover, the fact that Cutler sold Leeds stock on June 22, 1978, because it was more financially advantageous to do so at that time than at a later time cannot be a ground on which liability under section 16(b) is avoided. The short-swing transactions which section 16(b) is designed to prevent will almost always be the result of financial considerations.

In short, the transactions at bar may be fairly characterized as voluntary purchases and sales of securities for cash. As such, it is clear that they are not among those defined by the Court in *Kern County* as unorthodox. The Court clearly distinguished voluntary cash-for-stock transactions from unorthodox ones in stating:

> "Although traditional cash-for-stock transactions that result in a purchase and sale or a sale and purchase within the six-month, statutory period are clearly within the purview of § 16(b), the courts have wrestled with the question of inclusion or exclusion of certain 'unorthodox' transactions." 411 U.S. at 593, 93 S.Ct. at 1744.

Moreover, Cutler's transactions do not fall into any of the categories of potentially unorthodox transactions listed by the court:

> " . . . stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassifications, and dealings in options, rights and warrants." Id. at 593 n. 24, 93 S.Ct. at 1744.

This interpretation of *Kern County* is supported by two post-Kern decisions. In *Allis-Chalmers Mfg. Co. v. Gulf & Western Industries, Inc.,* 527 F.2d 335, 351 (7th Cir. 1975), cert. denied, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976), the court stated:

> "The court [in *Kern* ] did not suggest that ordinary, voluntary transactions commonly recognized as purchases and sales would not automatically trigger the application of section 16(b) in future cases as they uniformly have in the past."

In *American Standard Inc. v. Crane Co.,* 510 F.2d 1043, 1060 (2d Cir. 1974), cert. denied, 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975), the court stated:

"Examination of the possibility of abuse in the transaction to determine whether it should come within the automatic ban ascribed to § 16(b) by cases (in language at least) like *Park & Tilford v. Schulte,* [160 F.2d 984 (2d Cir.), cert. denied 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947)], has thus far been limited to situations where there has been a 'conversion' of securities rather than a purchase or sale for cash."

Since it is undisputed that Cutler was a beneficial owner of Leeds between January 17, 1978, and June 22, 1978, and I have determined that Cutler purchased and sold 724,440 shares of Leeds common stock within the meaning of section 16(b), Leeds is entitled to summary judgment as to Cutler's liability for the profits realized by Cutler on the purchase and sale of those shares.

## III. DIVIDENDS AS PART OF PROFITS

■ The second issue facing the court is whether Cutler is liable for the dividends it received on the 724,440 shares it purchased and sold in 1978. The portion of section 16(b) which is most pertinent to this issue states that insiders must disgorge "any profit realized . . . from any purchase and sale."

I am in agreement with those courts that have concluded that normally dividends should not be considered an element of profit separate from the difference between purchase and sale price. *Adler v. Klawans,* 267 F.2d 840, 849 (2d Cir. 1959); *Allis-Chalmers Mfg. Co. v. Gulf & Western Industries, Inc.,* 372 F.Supp. 570, 588–89 (N.D.Ill. 1974).

In the latter case, the court stated:

"Experts in the field look upon anticipated dividends as part of the package for which the consideration is paid when the stock is purchased. In addition, dividends are not an element of profit in the sense that they do not result from the purchase and sale of stock, but rather come from the holding of stock. See 45 Va.L.Rev. 1057, 1060 (1959). In the language of the statute dividends logically are not profit. The statute reaches 'profit realized from the purchase and sale'. Dividends thus are treated by the statute like an operational earning or income. This statutory interpretation reads upon the ordinary thinking about dividends in the market place. Except where they are a matter of special concern, the market price generally is presumed to cover dividends reasonably anticipated. At least to the extent that they regularly are paid, they are considered absorbed in the price paid for the stock." Id. at 588–89.

Thus, dividends are only recoverable under section 16(b) when they are so inextricably connected to the decision to purchase and sell the shares in question that to allow the insider to retain such dividends would frustrate the purpose of section 16(b). *Blau v. Lamb,* 363 F.2d 507, 528 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967); *Adler v. Klawans, supra* at 849.

In the instant case, Leeds has neither claimed that Cutler engaged in short-term speculation for the purpose of capturing dividends nor demonstrated that this might be the type of case in which the price per share did not reflect reasonably anticipated dividends. It is undisputed that in the year prior to Cutler's purchase of the 724,440 shares in question, Leeds paid quarterly dividends of 15¢ per share. During the five month period in which Cutler held the 724,440 shares, Leeds twice paid quarterly dividends of 18¢ per share. In my judgment, this schedule of dividends reflects regular payments which might normally be anticipated by investors. Thus, the profits realized in this case are most reasonably represented by the increase in the price per share which Cutler realized when it sold the stock on June 22, 1978.

Therefore, IT IS ORDERED that the motion of Leeds & Northrup for summary judgment on the issue of liability be and hereby is granted except that insofar as Leeds & Northrup seeks to recover the dividends received by Cutler-Hammer between January 17, 1978, and June 22, 1978, Leeds

& Northrup's motion for summary judgment is denied.